**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| VAN C. SHER and CAROL L. SHER | : | |
| on behalf of themselves and their minor son, | : | CIVIL ACTION |
| ANTHONY SHER, | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | NO. 11-1525 |
| | : | |
| UPPER MORELAND TOWNSHIP SCHOOL | : | |
| DISTRICT, et al. | : | |
| | : | |
| Defendants. | : | |

_____ :

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                    **AUGUST 19, 2011**

Presently before the Court is Defendants, Upper Moreland Township School District ("UMSD"), Superintendent of UMSD Dr. Robert Milrod ("Dr. Milrod"), and Upper Moreland High School Psychologist Howard Cohen's ("Cohen") (collectively, "Defendants") Motion to Dismiss. Also before the Court is Plaintiffs, Van C. Sher, Carol L. Sher's, (collectively, "Plaintiffs") Motion for Appointment of Counsel brought on behalf of themselves and their minor son Anthony Sher ("Anthony"). For the following reasons, Defendants' Motion to Dismiss will be granted in its entirety and Plaintiffs' Motion for Appointment of Counsel will be denied.

**I.      FACTS**

Plaintiffs are currently proceeding pro se on behalf of themselves and their minor son Anthony in this action against UMSD and individual Defendants Dr. Milrod and Mr. Cohen.[1]

_____

[1] It is unclear whether Plaintiffs have named Messrs. Milrod and Cohen in their official or individual capacities. Upon careful inspection of the Complaint, it appears as though Plaintiffs

Sixteen-year-old Anthony was diagnosed as having Attention Deficit Hyperactivity Disorder ("ADHD") on or about August of 2009.[2] (Compl. ¶¶ 14, 63, 80(g)); (Defs.' Mot. to Dismiss, Ex. A, Spec. Ed. Hearing Decision ¶¶ 22-23.)[3] Anthony transferred to UMSD from a private school in the eighth grade. (Id. at ¶¶ 17, 26-27.) According to Plaintiffs, prior Anthony's transfer, he was involved in extracurricular activities, sports, his school drama program, and community service. (Id. at ¶ 23.) He also scored very well on his PSAT exam. (Id.)

Plaintiffs aver that, unfortunately, Anthony's model behavior deteriorated after he transferred to UMSD in the eighth grade. (Id. at ¶ 27.) In the eighth grade, Anthony received approximately twenty-eight disciplinary sanctions consisting of detentions, in-school-suspensions, and at least one out-of-school suspension for: refusing to carry out directions, threatening other students, making derogatory remarks to students, poking/touching students, acting disrespectfully towards staff, disrupting classes, using profanity, being present in unauthorized areas during the school day, bringing a toy gun to school, throwing objects, misconduct during a fire drill, misconduct during detention, refusal to participate in class, and unauthorized use of a username/password. (Defs.' Mot. to Dismiss, Ex. A, Spec. Ed. Hearing

---

have named those Defendants in their official capacity as the Complaint states "Defendant is the [UMSD], which will include it agents and administrators for purposes of description and responsibility." (Compl. ¶ 6.)

[2] ADHD is a chronic condition that includes a combination of problems such as difficulty sustaining attention, hyperactivity, and impulsive behavior. http://www.mayoclinic.com/health/adhd/DS00275 (last visited July 25, 2011).

[3] Generally, the court may not consider documents outside of the pleadings when ruling on a motion to dismiss. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). However, a court may consider public documents and prior judicial proceedings without converting a motion to dismiss into one for summary judgment. In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 292-93 (3d Cir. 1999).

Decision ¶¶ 3, 17.)  In the ninth grade, Anthony was involved in thirty-one behavioral incidents

due to: possession of electronics, refusal to carry out directives, disrespect towards staff,

inappropriate comments, disruption of class, throwing objects, failure to report to detention,

fighting, hallway misconduct, vandalism, and refusal to participate in class.  (Id. at ¶ 21.)  These

incidents resulted in verbal warnings, detentions, in-school suspension, and out-of-school

suspension.  (Id. at  ¶ 22.)  In the tenth grade, Anthony was involved in eight behavioral incidents

where he was the offender, including failure to report to detention, insubordination/disrespectful

behavior, theft, harassment, disruption of class, throwing objects, and fighting.  (Id. at ¶ 34.)  The

incidents resulted in detentions and out-of-school suspensions.  (Id. at ¶ 35.)

Plaintiffs allege that they requested counseling for Anthony when his behavior changed

for the worse but that UMSD failed to fully provide it.  (Id. at 28.)  According to Plaintiffs,

UMSD also failed to recognize clear indicators that Anthony suffered from a learning disability,

despite the fact that Anthony's father informed UMSD that he suffered from ADD and that

Anthony's behavior was typical of the disorder.  (Id. at ¶ 56.)  Because Anthony has been

diagnosed with ADHD, Plaintiffs believe that Anthony's behavior was purely symptomatic of

that disability and, thus, any punishments or disciplinary actions by UMSD were unfairly dealt

and should be expunged.  (Id. at ¶ 58.)  UMSD's alleged wrongful acts cover a great variety of

misconduct, but Plaintiffs' allegations may be condensed into the following conclusions: (1)

Anthony has ADHD, which made him act out and misbehave in school (Id.); (2) the Defendants,

rather than inquiring into whether Anthony had ADHD (or some other disability) and

formulating an appropriate public education, inappropriately responded to Anthony's behavior by

assigning him traditional discipline such as suspensions and other disciplinary write-ups (Id. at ¶¶

45, 47, 63, 67); and (3) Anthony has suffered emotional and medical harm as a result of the Defendants' negligence in diagnosing and treating his disability (Id. at 10).

In their Complaint, Plaintiffs reference a Pennsylvania Special Education Hearing ("due process hearing"), which took place on October 5, 2010, November 17, 2010, and November 22, 2010. The issues to be decided were: (1) does the student qualify as a "child with a disability" under the Individuals with Disabilities Education Act ("IDEA")? If so, did the district fail in its obligations toward the student under the IDEA?; (2) did the district fail to meet its obligations to the student as a "protected handicapped student" under Section 504 of the Rehabilitation Act ("Section 504")?;[4] and (3) If the answer to the foregoing two questions is in the affirmative, is the student entitled to a remedy?  (Defs.' Mot. to Dismiss, Ex. A, Spec. Ed. Hearing Decision at 3.)

The findings of fact revealed a history of cooperative efforts between Plaintiffs and UMSD to fashion a FAPE for Anthony.  For instance, after Plaintiffs informed UMSD that a licensed psychologist and certified school psychologist diagnosed Anthony with ADHD/combined type and conduct disorder in August of 2009, UMSD recommended that Anthony be provided with a 504 plan[5] to help him with organizational skills and a number of school-based accommodations.  (Id. ¶¶ 23-24.)  Plaintiffs agreed to the proposed 504 plan on

---

[4] Section 504 is codified at 29 U.S.C. § 701 et seq.  It provides, in relevant part: No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).  Section 504 applies to public schools that receive Federal financial assistance and its implementing regulations in this context are codified at 34 C.F.R. Part 104 et seq.

[5] Section 504's implementing regulations provide a detailed scheme for fashioning a FAPE for students with qualifying disabilities.  See 34 C.F.R. 104.35.  The plan for implementing a FAPE is commonly referred to as a "Section 504 plan."

October 8, 2010,[6] which included accommodations such as regular communication between home and school, an assignment book, preferential seating, verbal and non-verbal cues, extended time on tests as needed, and the opportunity to meet with a school counselor or school psychologist as needed. (Id. at ¶ 29.) Apparently, the school psychologist never shared the 504 plan with Anthony as he was required to do. (Id. at ¶ 30.) In December of 2009, Plaintiffs requested another comprehensive psycho-evaluation for Anthony, but later withdrew consent for the evaluation for unknown reasons on January 29, 2010. (Id. at ¶¶ 31-32.) Simultaneously, in late January 2010, Plaintiffs and UMSD met to revise the 504 plan but Plaintiffs were not aware that it was finalized until March of 2010. (Id. at 33.) Ultimately, Plaintiffs did not approve the revised 504 plan, because Anthony withdrew from the district. (Id.)

The Hearing Officer issued his decision on December 28, 2010. He concluded that:

> [Anthony] did not qualify as a child with a disability under the IDEIA.[7] The District, though significant substantive omissions, failed to have a Section 504 plan in place to address [Anthony]'s ADHD. This resulted in a denial of FAPE under the obligations of Section 504, but the deprivation did not rise to the level where compensatory education is owed as a remedy. Finally, the District did not discriminate against the student as a result of his disability.

(Id. at 17-18.) The Hearing Officer issued the following Order:

> In accord with the findings of fact and conclusions of law . . . , the student does not qualify as a child with a disability under the IDEIA. The Upper Moreland Township School District has, under the obligations set forth under Section 504, denied the student a FAPE from April 23, 2008 through October 8, 2009. This denial of FAPE, however, does not rise to the level that compensatory education is owed. The Upper

---

[6] The administrative record states that Plaintiffs agreed to the proposed 504 plan on Obtoter 8, 2010. This is somewhat confusing as Plaintiffs withdrew Anthony from school in mid-March 2010. Thus, we assume that Plaintiffs agreed to the 504 plan in October of 2009.

[7] The Hearing Officer referred to the name given to the IDEA in its amended form, the Individuals with Disabilities Education Improvement Act of 2004, P.L. 108-446, 118 Stat. 2647.

Moreland Township School District has not discriminated against the student as a result of his disability.

(Id. at 18.)  Plaintiffs state in their Complaint that they had in effect "won" the hearing by "proving FAPE," but took issue with the fact that compensatory education was not awarded to them.  (Compl. ¶ 10.)  The Complaint does not state whether Plaintiffs ever appealed the decision of the Hearing Officer as provided for in the statute, and Plaintiffs have indicated that they are not attempting to appeal the decision in the present action.[8]  (Mot. to Remand at 1.)  However, the Complaint also states "[Plaintiffs] can now show that all of the considerations were not taken into consideration for the compensatory education" which was not awarded by the Hearing Officer.  Because Plaintiffs are proceeding pro se, we will construe their pleadings liberally and consider all causes of action which can be fairly gleaned from their pleadings.

Plaintiffs commenced this action by filing a Complaint in the Court of Common Pleas of Montgomery County on February 15, 2011.  In Count I of the Complaint, Plaintiffs allege that "The Defendant and its agents have failed to uphold the laws pertaining to students according to the Federal laws of the [ADA] and [§ 504] for the learning disabled, including FAPE . . . After written notice of these violations, Defendant blatantly disregarded any attempts to rectify the situation."[9]  (Compl. ¶ 69.)  In Count II, Plaintiffs claim that Anthony was the victim of reverse

---

[8] Plaintiffs assert that the due process hearing was a pre-requisite for commencing the instant action.  As we will later discuss, Plaintiffs are obligated to exhaust administrative remedies prior to bringing suit for FAPE-related claims.  However, Plaintiffs have also insisted that the instant action has nothing to do with the ADA, Section 504, the IDEA or Title VI.

[9] It is unclear whether Plaintiffs intend to assert claims under either the IDEA or § 504 in light of their "Motion Not to Dismiss and to Remand Back to Montgomery County" (Doc. No. 3), which contained a list of amendments to their Complaint to void all reference to federal law. However, considering the Complaint in its entirety, we feel the most prudent course is to include those claims in the disposition of this Motion along with their common law claims.

discrimination.  (Id. at ¶ 71.)  In Count III, Plaintiffs complain that UMSD violated the Right to

Know Law ("RTKL")[10] by failing to provide a safe environment.  (Id. at ¶ 73.)  In Count IV,

Plaintiffs claim that UMSD violated the "[First] Amendment of the United States of America and

the Bill of Rights by subjecting Plaintiffs' son to harassment and ridicule as well as mental

anguish over the treatment used to question him on numerous occasions."  (Id. at 75.)  In Count

V, Plaintiffs complain that the UMSD's Student Handbook is "over 10 years old, outdated, and

followed by [UMSD] on a basis to justify any actions they feel they have to take."  (Compl. ¶

77.)  Finally, in Count VI, Plaintiffs complain that "the actions by the Defendant were malicious

and intentional and were intent on harming [Anthony] both physically and mentally."  (Id. at ¶

79.)

In terms of relief, Plaintiffs are requesting a combination of monetary damages and

injunctive relief.[11]  (Id. at ¶ 80(a)-(m).)  The injunctive relief is aimed at correcting perceived

shortcomings of the staff and teachers at UMSD in their dealings with children who suffer from

disabilities.  (Id.)  The requested injunctive relief also requires UMSD to adopt a multitude of

internal operating procedures to facilitate its improved handling of children with disabilities.  (Id.

at ¶ 80(c), (d), (f).)  Furthermore, Plaintiffs would have UMSD issue various apologies to

Anthony  (Id. at ¶ 80(a).)  Moreover, the requested injunctive relief all but precludes UMSD from

---

[10] The RTKL, 65 P.S. § 67.101 et seq., generally governs the procedure for requesting information from Pennsylvania government agencies.

[11] Plaintiffs believe that the Hearing was a pre-requisite to instituting the present action. However, this logic is at odds with the statutory scheme providing that a party who is unsatisfied with the decision of the Hearing Officer may appeal the decision to a state-level administrative hearing and then to a court of law because Plaintiffs claim they are not appealing the Hearing Officer's decision.  Furthermore, a due process hearing is not a pre-requisite for filing a civil suit against the Defendants generally.

disciplining Anthony by any traditional means.  (Id. at ¶ 80(g).)  Other injunctive relief seeks to

expunge all of Anthony's disciplinary records and all police reports filed against him.  (Id. at ¶

80(j), (l).)  Plaintiffs demand monetary damages in excess of $5 million to "cover a potential

lifetime of psychiatric treatment, damages for future salaries for not being able to go to a college

of choice based on Defendants not expunging medical related record of discipline, and mental

and physical damage potential for all of the Plaintiffs."  (Id. at ¶ 80(e).)  Plaintiffs also seek

"[f]ull restitution of any costs and expenses the Plaintiff had for any direct aspects of this case"

and "pay for on-going treatment" of Anthony  (Id. at ¶¶ 80(b), (k).)

On March 4, 2011, Defendants removed this case here on the basis of 28 U.S.C. § 1331.

On March 11, 2011, the Defendants filed a Motion to Dismiss Plaintiffs' Complaint arguing that

Plaintiffs had failed to state a claim upon which relief can be granted and that Plaintiffs could not

proceed pro se on behalf of Anthony.  On March 17, 2011, Plaintiffs filed a "Motion Not to

Dismiss and Remand Back to Montgomery County, PA" ("Motion to Remand") claiming that

their references to Federal laws were only intended to serve as "background" and that their

claims were only premised on state common law tort actions such as malpractice.  (Mot. to

Remand at 1-3.)  Along with the Motion to Remand, Plaintiffs submitted a list of amendments to

their Complaint in an attempt to void any reference to the IDEA, ADA, § 504, and FAPE.

Despite these amendments, which were not properly submitted, Plaintiffs' causes of action and

relief still fell within the jurisdiction of this court as we will discuss more fully below.

Accordingly, we denied the Motion to Remand on March 21, 2011, finding that we did have

original jurisdiction over the claims in this case.

On April 4, 2011, we held a status conference to discuss whether it was permissible for

8

Plaintiffs to represent Anthony because no Plaintiff is a licensed attorney. We gave Plaintiffs several weeks either to submit a brief on the issue of parental representation of their minor children or to retain counsel. That same day, Plaintiffs submitted a document to the Court stating that they only intended to go forward on claims of negligence, malpractice, and discrimination and that no part of their case rested on federal law save for "the treatment of an ADHD student." (Apr. 4, 2011 Ltr. at 1.) However, Plaintiffs cited to two online articles addressing the rights of parents to litigate pro se on behalf of their children specifically under the IDEA.[12] This leads us to believe that Plaintiffs have not completely abandoned their federal claims. Furthermore, some of Plaintiffs' claims are rooted in federal constitutional law despite the amendments submitted with their Motion to Remand.

On May 6, 2011, we received a letter of representation informing us that Plaintiffs had retained counsel. Shortly thereafter, on May 21, 2011, Plaintiffs informed the Court by letter that their counsel could not represent them due to a conflict of interest and that all further attempts to retain counsel were met with unresponsiveness or prohibitively high estimates. At this point, Plaintiffs requested that we appoint counsel to represent them.

We will decide both the Defendants' Motion to Dismiss and Plaintiffs' Motion for Appointment of Counsel together as the resolution of each requires similar analyses.

## II.   STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). Under Rule 12(b)(6), the

---

[12] Plaintiffs included the following URL's in support of their argument that they should be allowed to represent Anthony: (1) http://www.pilcop.org/dis-edu_Winkelman_1–1-5.pdf and (2) http://sweetstevens.com/articles/documents.ParentalIDEARepresentation_000.pdf.

9

defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, the Supreme Court stated that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  550 U.S. 544, 555 (2007).  Following Twombly, the Third Circuit has explained that the factual allegations in the complaint may not be "so undeveloped that [they do] not provide a defendant the type of notice which is contemplated by Rule 8."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  Moreover, "it is no longer sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'"  Id. (alteration in original) (quoting Twombly, 550 U.S. at 563 n.8).  Furthermore, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level."  Id. at 234 (quoting Twombly, 550 U.S. at 555).  "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  Id. (quoting Twombly, 550 U.S. at 556).

Notwithstanding Twombly, the basic tenets of the Rule 12(b)(6) have not changed.  The Knit With v. Knitting Fever, Inc., No. 08-4221, 2009 U.S. Dist. LEXIS 30230, at *6 (E.D. Pa. Apr. 8, 2009).  The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief, not detailed factual allegations.  Phillips, 515 F.3d at 231.  Moreover, when evaluating a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiff's complaint, and must view any reasonable

10

inferences that may be drawn therefrom in the light most favorable to the plaintiff.  Id.; Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

### A.   Motion to Dismiss

#### 1.   Count I: FAPE claims

##### a.   Whether Plaintiffs may litigate FAPE-based claims under Section 504

Defendants argue that Plaintiffs are attempting to assert a non-existent cause of action for enforcement of Section 504's implementing regulations requiring a school district to provide a FAPE and, thus, the claim must be dismissed.  Defendants further argue that, according to Alexander v. Sandoval, 532 U.S. 275 (2001), enforcement of statutorily created rights must be provided for in the statute itself.  (Mot. to Dismiss at 4).  In Sandoval, the Supreme Court held that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."  532 U.S. at 291.  The Defendants argue that, since there is no indication that Congress intended to create a private cause of action, and the regulations go "far beyond" the intent of the statute, they do not create an enforceable right.  (Mot. to Dismiss at 4.)

Additionally, the Defendants argue that, to the extent that any sort of Section 504 regulatory FAPE right is actionable, it is only actionable to the extent that Section 504 regulations run together with the IDEA-based FAPE right.  (Id. at 5.)  This, the Defendants argue,

11

is due to the fact that Section 504's implementing regulation, 34 C.F.R. § 104.36, provides that

the due process procedures for Section 504 are the same as those for the IDEA.[13]  (Id.)

Moreover, Defendants argue that, in this case, Plaintiffs have not followed the due process

procedures required under the IDEA, because they have not challenged the administrative

hearing officer's ruling through a statutory appeal as provided in 20 U.S.C. § 1415.  That

provision allows for an impartial due process hearing (20 U.S.C. § 1415(f)), an appeal to the state

educational agency (20 U.S.C. § 1415(g)), and finally a judicial appeal (20 U.S.C. §1415(i)(2)).

Finally, the Defendants argue that Plaintiffs have not stated a claim for relief stemming from the

FAPE violation, because they have not alleged harm or challenged the contrary administrative

finding by pleading particular errors in the hearing officer's analytical process.  (Id. at 5-6.)

We agree with the Defendants that a plaintiff must first exhaust the administrative

remedies under the IDEA prior to instituting an action for a school district's failure to provide a

FAPE under Section 504.  In Derrick F. v. Red Lion Area Sch. Dist., 586 F. Supp. 2d 282 (M.D.

Pa. 2008), the district court discussed whether a plaintiff's Section 504 and ADA claims must be

dismissed for failure to exhaust the administrative remedies available under the IDEA.  586 F.

Supp. 2d at 295.  The district court held that "where a plaintiff brings an action under Section

504 or the ADA seeking relief that is also available under the IDEA, exhaustion of the

---

[13] 34 C.F.R. § 104.36 provides in relevant part:

A recipient who operates a public . . . secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placements of persons who, because of a handicap, need or are believed to need special instruction or related services, a system of procedural safeguards . . . Compliance with Section 615 of the Education of the Handicapped Act is one means of meeting this requirement.

34 C.F.R. § 104.36.  The Education of the Handicapped Act was the IDEA's predecessor.

administrative remedies provided by the IDEA is required 'to the same extent as would be required had the action been brought under [the IDEA].'" Id. (citing 20 U.S.C. § 1415(l)). See also 24 C.F.R. § 300.516(e).  "The IDEA administrative exhaustion requirement 'allows a school district to bring its expertise to bear and affords the state an opportunity to correct its own mistakes.'" James S. ex rel. Thelma S. v. Sch. Dist. of Philadelphia, 559 F. Supp. 2d 600, 616 (E.D. Pa. 2008) (citing McKellar v. Com. of Pennsylvania Dept. of Educ., No. 98-4161, 1999 WL 124381, at *2 (E.D. Pa. Feb. 23, 1999)).  In Pennsylvania, administrative exhaustion consists of participating in a due process hearing and taking an appeal to the state appellate body.  22 Pa. Code. § 14.162; Blunt v. Lower Merion Sch. Dist., No. 07-3100, 2008 WL 442109, at *5 (E.D. Pa. Feb. 15, 2008) (describing two-level review process in Pennsylvania); Kristi H. v. Tri-Valley Sch. Dist., 107 F. Supp. 2d 628, 631 (M.D. Pa. 2000) (same).  Id.  Conversely, should a plaintiff seek relief for a claim that is not available under the IDEA, he or she is not required to exhaust IDEA remedies prior to bringing those claims in federal court.  Id.  See also, James S., 559 F. Supp. 2d at 617 (recognizing exhaustion not required for Section 504 claims seeking compensatory damages not available under the IDEA).

Whether Plaintiffs may pursue a Section 504 FAPE-based claim in this Court depends on whether FAPE is a remedy under both the IDEA and Section 504.  The IDEA includes a specific provision conditioning a state's receipt of federal educational funds upon the state's obligation to provide a FAPE to children with disabilities at 20 U.S.C. § 1412(a)(1).  A district's denial of a FAPE may be appealed via the two-step administrative process mentioned above.  See 20 U.S.C.A. § 1415, et seq.  Section 504's FAPE obligations arise from its implementing regulations.  In particular, 34 C.F.R. § 104.33 provides that a recipient (of federal funds) who

operates a public elementary or secondary education program shall provide a FAPE to each

qualified handicapped person within the recipient's jurisdiction.  34 C.F.R. § 104.33.  Section

504 specifically provides that the procedural safeguards available to contest the denial of a FAPE

shall be the same as under the IDEA.  34 C.F.R. § 104.36.  Thus, it is evident that claims based

on a denial of FAPE  must be exhausted under the procedural due process protective scheme

contained in the IDEA even if brought under Section 504.  Because Plaintiffs have not appealed

the denial of FAPE to the state appellate body, they cannot advance any FAPE-based claims in

this Court.  Accordingly, we will dismiss Plaintiffs' Count I to the extent that it purports to seek

any relief for UMSD's denial of a FAPE for Anthony under Section 504.

       b.      Plaintiffs' Section 504 statutory discrimination claim

As noted, Section 504 provides, in relevant part, that: "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal Financial Assistance . . ."  20 U.S.C. § 794(a).

The elements of a statutory Section 504 discrimination claim are: (1) a qualifying disability; (2)

qualification to participate in school activities; (3) receipt of federal financial assistance; (4)

exclusion from participation in, or denial of the benefits of, or otherwise discriminated against in

the school program.  Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238 (3d Cir. 1999)

(citing W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995), abrogated on other grounds by A.W. v.

Jersey City Public Schools, 486 F.3d 791 (3d Cir. 2007)).  The Defendants correctly assert that

the elements of an ADA claim are essentially the same but without the element of federal

funding.  See Chambers v. Sch. Dist. of Philadelphia, No. 05-2535, 2007 WL 515497, at *1

(E.D. Pa. Feb. 12, 2007).

The Defendants concede that the first, second, and third elements may be assumed.  In regards to the fourth element, the Defendants argue that Plaintiffs have not alleged that Anthony was excluded from participation in, or denied the benefits of, or otherwise discriminated against in the school program.  (Mot. to Dismiss at 6-7.)  Additionally, the Defendants argue that, because Plaintiffs claim that they are not appealing the Hearing Officer's decision, that decision is binding on the Parties.  The Hearing Officer specifically found that UMSD did not:

> . . . exclude the student from District programs or activities, den[y] the student the benefits of District programs or activities, or discriminate[] against the student in its treatment of the student.  Indeed, even given the extensive disciplinary history of the student, the District's treatment of the student was fair and did not result in any unwarranted or excessive exclusion from school. . .

(Defs.' Mot. to Dismiss, Ex. A, Spec. Ed. Hearing Decision at 16.)

We agree that the Hearing Officer's finding must be left undisturbed in the absence of an appeal of his decision or allegations that the Hearing Officer erred in his analysis or conclusion.  See Breanne C. v. Southern York County Sch. Dist., 665 F. Supp. 2d 504, 506 n.4 (M.D. Pa. 1009) (deferring to due process hearing officer's findings of fact when uncontested by parties).  Additionally, we find that Plaintiffs have not alleged that Anthony was excluded from participation in, or denied of the benefits of, or otherwise discriminated against in the school program.  Plaintiffs allege that Anthony was discriminated against by UMSD because he received numerous disciplinary actions.  It is clear that Plaintiffs heartily disagree with UMSD's style and frequency of discipline because they believe all or most discipline was given in response to behavior which was solely caused by Anthony's ADHD.  The Defendants argue that

Anthony's status as having a "qualifying disability" does not prohibit UMSD from disciplining Anthony under Section 504 as there is no proscription against discipline in either the text of Section 504 or its implementing regulations.  We have reviewed the relevant statutes and case law and, likewise, were unable to find any such prohibition.[14]  Thus, we find that Plaintiffs have failed to allege a cause of action for Section 504 statutory discrimination.

      c.      Section 504 and ADA claims against the individual Defendants

Plaintiffs may not bring an ADA or Section 504 claim against Messrs. Milrod or Cohen as a matter of law.  Section 504's and the ADA's non-discrimination rules are directed at federal funding recipients and at public entities.  A.W., 486 F.3d at 804.  In light of this fact, the Third Circuit holds that individual liability is not available under Section 504.  Taylor v. Altoona Area Sch. Dist., 513 F. Supp. 2d 540, 556 (W.D. Pa. 2007) (citing A.W., 486 F.3d at 804).  Thus, to the extent that Plaintiffs attempt to state either an ADA or Section 504 claim against the individual Defendants, such claims fail as a matter of law.[15]

---

[14] We note that, the Hearing Officer determined that Anthony did "not qualify as a child with a disability under the IDEA" and was only "a protected handicapped student" under Section 504.  (Defs.' Mot. to Dismiss, Ex. A, Spec. Educ. Hearing Dec. at 16-17.)  Because Plaintiffs do not contest these findings, we need not address the Defendants arguments relating to the applicability of disciplinary regulations under the IDEA.

[15] Plaintiffs submitted an amendment to Count I, which states:

The Defendants and its agents have failed to uphold the laws pertaining to students according to the laws of the school district as well as malpractice in treatment of a disabled student and unfair practice of medical treatment, bullying, targeting, providing a safe environment, child endangerment, failure to abide by the internal obligations made known to the public, lying to Plaintiff[s] about performance of school program and officials, and purposely trying to harm Plaintiffs.

These allegations are merely legal conclusions and do not sufficiently allege any of the causes of action contained therein.  Thus, we find that Plaintiffs have failed to state a cause of action for

2.      Count II: Fourteenth Amendment Equal Protection

In Count II of the Complaint, Plaintiffs assert that the Defendants "by [their] actions, exercised reverse racial discrimination, including unequal penalties for alleged racial incidents" in violation of Anthony's Fourteenth Amendment rights.[16]  It is unclear from their Complaint, thus we assume that Plaintiffs are referencing the incident where Anthony was suspended for exchanging a racially charged greeting with a minority friend.  (Compl. ¶ 62.)  Allegedly, Anthony was suspended for greeting a black friend by saying, "White power," and his friend responded, "Jew Boy."  (Id.)  According to Plaintiffs, the suspension was discriminatory because the minority was not suspended.  (Id.)  Plaintiffs do not reference race at any other point in their Complaint.  The Defendants argue that Plaintiffs have failed to state a cause of action because they have not alleged how UMSD's suspension of Anthony differs from their treatment of other similarly situated individuals or what "similarly situated" might look like.

In light of the lengthy and confusing nature of the Complaint and the virtual hodgepodge of allegations contained therein, we feel it necessary to attempt to clarify the nature of Plaintiffs' Count Two.  Considering the Complaint as a whole, and giving due consideration to the Amendments submitted by Plaintiffs, Count II is properly viewed as a 42 U.S.C. § 1983 ("Section 1983") action.[17]  We reach this conclusion because Plaintiffs seek to recover damages

_____

any of the alleged causes of action contained in the amended Count One.

[16] Plaintiff's amendment omitting the reference to the Fourteenth Amendment does little to alter the constitutional nature of the claim.  Thus, it is appropriate to analyze Count II under the Fourteenth Amendment's equal protection clause.

[17] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, subjects,

and injunctive relief for what can only be viewed as a constitutional violation arising under the

Fourteenth Amendment, the equal protection clause in particular. Additionally, because the

Defendants are a school district, a superintendent of the school district (in his official capacity),

and a school psychologist (in his official capacity), Plaintiffs are suing "persons" amenable to

suit under the statute. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 690 (1978).

Although a constitutional violation may give rise to a cause of action in and of itself, the only

means by which to recover the relief sought by Plaintiffs is through the vehicle of Section 1983.

To allege a claim for reverse racial discrimination a plaintiff must allege that "the

defendant treated the plaintiff 'less favorably than others because of his race . . .'" Iadimarco v.

Runyon, 190 F.3d 151, 163 (3d Cir. 1999) (considering reverse discrimination in employment

context) (citing Furno Const. Corp. v. Waters, 438 U.S. 567, 577 (1978)). See also, DiTommaso

v. Medicines Co., 754 F. Supp. 2d 702, 705 (D.N.J. 2010) (same). In the context of Equal

Protection claims under Section 1983 premised on race, a plaintiff is required to allege that the

defendant treated the plaintiff differently than similarly situated individuals and that the

difference in treatment was motivated by race. Bell v. Pennsbury Sch. Dist., No. 09-5967, 2011

WL 292241, at *5 (E.D. Pa. Jan. 31, 2011).

In Bell, a student alleged that his school district and several employees of the school

district improperly considered his race in their decision to "dismiss" him from the district. 2011

---

or causes to be subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and
laws, shall be liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress . . .

42 U.S.C. § 1983.

WL 292241, at *3.  The district court's analysis considered the defendant's status as a school

district and applied a standard consistent with <u>Monell</u>.  Thus, the <u>Bell</u> court found that, in order

to state a cause of action against the school district under Section 1983, for a school official's

deprivation of a plaintiff's constitutional rights, the plaintiff must show that the plaintiff's injury

resulted from an "official custom or policy"[18] of the school district, which was the driving force

behind its or an official's actions.  2011 WL 292241, at *4 (citing <u>Monell</u>, 436 U.S. at 690-92).

In other words, the district court required that the plaintiff plead and prove that:1) there was a

violation of the plaintiff's constitutional rights pursuant to an official policy, custom, or practice;

and 2) the school district's policy or custom caused that violation.  <u>Id</u>. <u>See also</u>, <u>Phillis v.</u>

<u>Harrisburg Sch. Dist.</u>, 2011 WL 2279674, at *4 (3d Cir. 2011) (slip opinion).  It went on to note

that, absent unusual circumstances, "proof of one single incident of unconstitutional activity is

not sufficient to impose liability under <u>Monell</u>.'" <u>Id</u>. (citing <u>Turner v. City of Philadelphia</u>, 22 F.

Supp. 2d 434, 437 (E.D. Pa. 1998)).

    Here, Plaintiffs' allegations are strikingly similar to those at issue in <u>Bell</u>.  That is,

Plaintiffs allege that UMSD improperly allowed race to enter into their decision to suspend

Anthony.  However, apart from that assertion, Plaintiffs fail to allege that this impermissible

conduct was pursuant to an official policy or custom, or practice or that the policy, custom, or

practice caused that violation.  Without more, we find that Plaintiffs have failed to state a cause

of action upon which relief can be granted for reverse racial discrimination.

---

[18] "Policy" includes official proclamations made by a municipal decision maker with final
authority, and "custom" is defined as 'practices of state officials . . . so permanent and well
settled as to virtually constitute law.'" <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 263 (3d Cir.
2010) (citing <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000)).

In addition to the reverse discrimination claim, Plaintiffs allege what could amount to a "class-of-one" claim under the equal protection clause.  To state a class of one equal protection claim, a plaintiff must allege that he or she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (citations omitted).  In Paragraph 66 of the Complaint, Plaintiffs state that UMSD discriminatorily reported Anthony to the police after he pushed a student out of the way, attempting to go to class.  (Compl. ¶ 66.)  Apparently, friction between Anthony and the other student began outside of school but continued on school grounds.  Plaintiffs allege that this "is another inconsistency whereas other incidents did not have reports filed including [Anthony's] past incidents and Plaintiffs can produce individuals or their parents in similar situations of the school policy, which affects the future of the children."  (<u>Id.</u>)

The first part of Plaintiffs' claim fails as they are comparing UMSD's responses to Anthony's previous misconduct to the singular incident where they reported his misconduct to the police.  Thus, they have not alleged that the treatment is different from *others* similarly situated.  Furthermore, Plaintiffs have not alleged that the difference in treatment was intentional or that UMSD had no rational basis for the difference in treatment.  Finally, Plaintiffs' have not sufficiently alleged what characteristics "similarly situated" would encompass.  Thus, we find that Plaintiffs have failed to sufficiently allege a "class-of-one" equal protection claim and we will dismiss this claim.  Thus, we will dismiss Plaintiffs' Count II in all respects.

       3.      Count III: Failure to Provide a Safe Environment and the Right to Know Law

Count III of Plaintiff's Complaint alleges that "Defendants failed to provide a safe

environment for the [sic] [Anthony] providing an environment known to be part of child

endangerment during each roughly 7-hour day that the Plaintiff[s'] son was in the Defendant[s']

care.  This is a violation of the Right to Know Law."[19]  (Compl. ¶ 73.)  We assume that Count

Three relates to UMSD's failure to engage the police to eliminate the alleged presence of heroin

in the school and violence in the school cafeteria.[20]  The Defendants argue that the Right to

Know Law, 65 P.S. § 67.101 et seq. ("RTKL") does not create a private right of action for any

sort of failure to provide a safe school environment.  The Defendants further argue that there is

no generalized right to a particular level of safety for students within public schools and that the

existing statutes and case law do not create an affirmative duty to create a safe environment.

The RTKL is:

> An Act providing for access to public information, for a designated open-records
> officer in each Commonwealth agency, local agency, judicial agency and legislative
> agency, for procedure, for appeal of agency determination, for judicial review and for
> the Office of Open Records; imposing penalties; providing for reporting by State-
> related institutions; requiring the position of certain State contract information on the
> Internet; and making related appeals.

65 P.S. § 67.101.  The RTKL prohibits a Commonwealth or local agency from denying a

requester access to a public record due to the intended use of the public record by the requester

unless otherwise provided by law.  65 P.S. §§ 67. 301, 67.302.  A "requester" is defined as "[a]

person that is a legal resident of the United States and requests a record pursuant to this Act."  65

---

[19] Plaintiffs submitted an amendment to the Complaint omitting reference to the RTKL.
However, the introductory remarks of the amendment list state that Plaintiffs wished only to omit
all references to federal law.  Since the RTKL is a Pennsylvania state law, we assume the
amendment was submitted in error.

[20] The Complaint is unclear and does not specify which of the numerous factual
allegations Plaintiffs seek to apply to any count.  We have done our best to apply the facts most
fitting to the respective counts.

P.S. § 67.101.  Should the agency deny a requester access to a public record, the RTKL lays out a comprehensive administrative enforcement scheme culminating in judicial review.  See 65 P.S. §§ 67.1101, 67.1301.  We must point out that the RTKL is only implicated by the *request* of public information.  Thus, in order for Plaintiffs to state a claim under the RTKL they must allege that they requested information relating to the safety of the school.  In its current form, the Complaint fails to so state.  Furthermore, our review of the overall statute and the relevant case law has not revealed any affirmative duty upon the Defendants to disclose information relating to the safety problems complained of by Plaintiffs.

Construing the Complaint in the light most favorable to Plaintiffs, Count II may also be interpreted as a common law negligence claim, alleging that UMSD breached a duty to keep the school safe or to inform Plaintiffs of the safety issues occurring on campus.  However, even under the general notice pleading provisions of Federal Rule of Civil Procedure 8(a), a negligence claim must contain allegations of: (1) the existence of a duty of obligation recognized by law; (2) a failure on the part of the defendant to conform to that duty or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant.  Calex Exp. Inc. v. Bank of America, 401 F. Supp. 2d 407, 412 (M.D. Pa. 2005) (citing T.A. v. Allen, 669 A.2d 360, 362 (Pa. Super. 1995)).

Here, Plaintiffs allege that UMSD had a duty, statutory or otherwise to inform them of incidents relating to the overall safety of the school.  Plaintiffs also allege that UMSD breached that duty by failing to inform them of the incidents.  However, Plaintiffs fail to specify the harm suffered or a causal link from the failure to affirmatively disclose the presence of fighting or drugs on school grounds to any such harm.  Thus, even under a negligence theory independent of

22

the RTKL, Plaintiffs have not sufficiently alleged a claim for failing to provide a safe environment.  Thus, we will dismiss Count III of Plaintiff's Complaint.

      4.      Count IV: First Amendment Claim

In Count IV, Plaintiffs allege that the Defendants "violated the [First] Amendment of the United States of America and the Bill of Rights by subjecting [Anthony] to harassment in [sic] and ridicule as well as mental anguish over the treatment used to question him on numerous occasions."  (Compl. ¶ 75.)  Plaintiffs claim that Anthony was "forced to write 'confessions' on a yellow pad in [the] Disciplinarians [sic] office [] without being advised of his rights to contact parents in 2007 or without an advocate as stated by Act 504."  (Id. at ¶ 29.)  The Defendants argue that these allegations fall outside of the rights and protections afforded by the First Amendment and that, even if pled under the Fifth, Fourth, or Fourteenth Amendment, Count Four still fails to state a claim upon which relief can be granted.

The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

U.S. CONST. amend. I.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."  Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994).  The First Amendment protects an individual's freedom of thought against state action and includes both the right to speak freely and the right to refrain from speaking at all.  Wooley v. Maynard, 430 U.S. 705, 714 (1977) (citing West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 633-34

(1943) (Murphy, J., concurring)).  "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts."  Id.  The right to speak and the right to refrain from speaking are complementary components of the "individual freedom of mind."  Id. (citations omitted).

Here, Plaintiffs do not allege that Anthony was forced to espouse an idea or belief that he did not share by UMSD or that he was punished by UMSD for refusing to espouse an imposed idea or belief.  Rather, Plaintiffs allege that Anthony had a First Amendment right to remain free from harassment and to have a parent or advocate present when questioned by UMSD staff members.  Plaintiffs further allege that UMSD violated those rights by failing to inform Anthony of those rights and demanding that he compose self-incriminating materials.  Based on these allegations, it is most likely that Plaintiffs meant to assert a violation of the Fifth Amendment's protection against self-incrimination, applied to the States through the Fourteenth Amendment. The conduct complained of simply does not fit within the ambit of First Amendment jurisprudence.

Plaintiffs' allegations relating to the "confessions" that Anthony was forced to write are properly analyzed under the Fifth Amendment right against self-incrimination, made applicable to the states through the Fourteenth Amendment.[21]  The Fifth Amendment provides in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend V.  It guarantees "the right of the person to remain silent unless he chooses to speak in the unfettered exercise of his own free will, and to suffer no penalty . . . for such

---

[21] Although the Defendants discuss whether this Count may be brought under the Fourth Amendment's protection against unreasonable searches and seizures, we find no support for such a claim in the Complaint.

silence." <u>Weaver v. Brenner</u>, 40 F.3d 527, 534 (2d Cir. 1994) (citing <u>Malloy v. Hogan</u>, 378 U.S.

1, 8 (1964)).  However, in the context of questioning by school officials, the right against self-

incrimination is considerably diminished.  In <u>Brian A. ex rel. Arthur A. v. Stroudsburg Area Sch.</u>

<u>Dist.</u>, 141 F. Supp. 2d 502, 511 (M.D. Pa. 2001), the parents of a minor student claimed that the

school district had violated their son's Fifth Amendment right to be free from self-incrimination

by "coercing a confession from [their son] without having first ensured the presence of his

parents and/or attorney and without first Mirandizing him. . ."  <u>Id.</u>  The district court reiterated

the well-established law that "under the federal constitution, students facing disciplinary action in

public schools are not entitled to Miranda warnings."  <u>Id.</u> (citing <u>Jarmon v. Batory</u>, 1994 WL

313063, at *11 (E.D. Pa. 1994); <u>In re D.E.M. v. Commonwealth</u>, 1999 727 A.2d 570 (Pa. 1999)).

The district court thus determined that the plaintiffs failed to state a claim for a violation of the

Fifth Amendment and dismissed the plaintiff's Fifth Amendment claims in respect to all alleged

violations.  <u>Id.</u>

 Plaintiffs' allegations in Count Four are nearly identical to those at issue in <u>Brian A.</u>

They allege that UMSD violated Anthony's rights by "forc[ing] him to write 'confessions' on a

yellow pad in [the] Disciplinarians [sic] office [] without being advised of his rights to contact

parents in 2007 or without an advocate as stated by Act 504."  (<u>Id.</u> at ¶ 29.)  Given the factual

similarities between the parties in this action and the parties in <u>Brian A.</u>, we find the reasoning

and conclusions of the <u>Brian A.</u> court persuasive.  Thus, we find that Plaintiffs' have failed to

state a claim for a violation of the Fifth Amendment right against self-incrimination.

 If Plaintiffs meant to allege a substantive due process claim, that claim also fails.  The

Fourteenth Amendment requires that no State "shall deprive any person of life, liberty, or

property, without the due process of law." U.S. CONST. amend XIV, § 1.  To state a due

process claim under the Fourteenth Amendment, a plaintiff must allege that the particular interest

at issue is protected by the substantive due process clause and the government's deprivation of

that protected interest shocks the conscience.  Walsh v. Krantz, 386 Fed. Appx. 334, 336 (3d Cir.

2010) (citing Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008)).  Accordingly, the first step in

evaluating this type of claim is to identify the exact contours of the underlying right said to have

been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional

right at all.  Chainey, 523 F.3d at 219 (citing Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000)

(en banc)).

Here, we infer that Plaintiffs are asserting that Anthony had a right to be free from

harassment by UMSD and its staff either during questioning or otherwise.  First, we find that

Plaintiffs have failed to articulate "the contours of the underlying right."  Chainey, 523 F.3d at

219 (citation omitted).  Additionally, we find that none of Plaintiffs' allegations "shock the

conscience."  The Complaint alleges that Anthony has ADHD and that he received numerous

suspensions and other disciplinary actions.  However, none of the disciplinary actions are

"shocking" and consist primarily of suspensions.  As we discussed above, the First Amendment's

protections do not contemplate a right to be free from harassment or ridicule or questioning by

school officials nor does the Fifth Amendment.  Thus, as a matter of law, Plaintiffs have failed to

allege a substantive due process violation under the Fourteenth Amendment in Count Four of

their Complaint.[22, 23]

---

[22] We also find that, Plaintiffs have not set forth any allegations relating to an official
policy or custom on the part of UMSD for the kind of constitutional violations encompassed
within Count IV and dismiss Plaintiffs' constitutional claims in Count Four on those grounds as

5.      Count V: Student Handbook Violations

In Count V, Plaintiffs allege that: "The student handbook, which is the regulatory document that students are to follow, is over ten years old, outdated, and followed by the Defendants on a basis to justify any actions they feel they have to take.  It is a violation of student's rights, causing mental anguish to Plaintiff and Plaintiff's son."  (Compl. ¶ 77.) Pennsylvania has long recognized a school's right to enact codes of conduct as a necessary corollary to providing an education.  See generally, Girard Sch. Dist. v. Pittenger, 392 A.2d 261 (Pa. 1978).  However, our research uncovered no private cause of action based solely upon the antiquity of a school's handbook or code of conduct.  The Defendants attempt to tease out various claims which could conceivably flow from or are in some way connected to, the student handbook.  For instance, the Defendants discuss whether Plaintiffs have alleged claims relating to due process or how the handbook is used.  However, even given Plaintiffs' pro se status, they still fail to allege material facts to support any of those claims.  Thus, we will dismiss Count V.

6.      Count VI: Malice and Intent

In Count VI of Plaintiffs' Complaint, they allege that "[t]he actions by the Defendant were malicious and intentional and were intent on harming the Plaintiff both physically and mentally."  (Compl. ¶ 79.)  Much like Count V, this count also fails to allege any recognizable

well.

[23] In their amended filing, Plaintiffs asked us to eliminate all reference to federal law and to delete the portion of Count IV linking UMSD's conduct to constitutional violations.  Although still unclear, a liberal construction of the amended Count Four may, if liberally construed, be interpreted to allege a putative tort for harassment.  However, under Pennsylvania law, the tort of harassment is not a recognized cause of action.  DeAngelo v. Fortney, 515 A.2d 594, 596 (Pa. Super. 1986); see also, Sobel v. Winguard, 531 A.2d 520, 522-23 (Pa. Super 1987). Accordingly, Count IV fails in all respects.

cause of action.  Although malice and intent are indeed elements for certain claims, those mental states are in no way actionable in and of themselves.  Accordingly, we must dismiss this Count as well. [24]

### C.    Plaintiffs' Motion for Appointment of Counsel

Having completed our analysis of whether Plaintiffs have sufficiently plead their claims, we will now consider whether they are entitled to appointment of counsel.  First, we must note that there is no constitutional or statutory right to appointed counsel for civil litigants.  Parham v. Johnson, 126 F.3d 454, 456-57 (3d Cir. 1997).  Although not constitutionally guaranteed, 28 U.S.C. § 1915(d) does provide for discretionary appointments:

> [t]he court may request an attorney to represent any such person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious.

Id.  In Tabron v. Grace, 6 F.3d 147, 153 (3d Cir. 1993), the Third Circuit enumerated a series of indeterminable, non-exhaustive factors for the district court to consider in a motion for appointment of counsel.  However, as a threshold issue, it must appear that the plaintiff's claim has some arguable merit in fact and law.  Id. at 155.  The court determined further that if the district court opines that the plaintiff's claims are arguably meritorious in law and fact, then the court will undertake a six-factor test:

(1)    the plaintiff's ability to present his or her own case;

---

[24] The Defendants have asserted that the Messrs. Milrod and Cohen are entitled to qualified immunity regarding Plaintiffs' constitutional claims.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Because we find that Plaintiffs have failed to allege any conduct that "violates clearly establish statutory or constitutional rights" 555. U.S. at 231, we need not resolve the issue of qualified immunity.

    (2)     the complexity of the legal issues;

    (3)     the degree to which factual investigation will be necessary and the ability to pursue such investigation;

    (4)     the amount a case is likely to turn on credibility determinations;

    (5)     whether the case will require the testimony of expert witnesses; and

    (6)     whether the plaintiff can attain and afford counsel on his or her own behalf.

Id. at 155-56.  Therefore, the district court is instructed to perform a two-prong analysis in considering a motion for appointment of counsel: (i) whether plaintiff has presented arguably meritorious claims; and (ii) whether the balance of the six-factor Tabron test weighs in favor of appointing counsel.

As this case is a civil action, we will employ the Tabron analysis.  Our initial inquiry then, must be whether Plaintiffs' claims have some arguable merit in fact and law.  As we discussed above, we have construed Plaintiffs' claims liberally as befitting their pro se status and we find that their claims are not arguably meritorious.[25]  Thus, we will decline to appoint counsel for all Plaintiffs.

An appropriate Order follows.

---

[25] Our reliance on pleadings and submissions prepared by Van C. Sher and Carol L. Sher in deciding the instant Motion and Request for Appointment of Counsel is consistent with the practice of courts facing similar situations where pro se parent litigants request that the court appoint counsel to represent their minor children.  See Banks-Bennett v. O'Brien, No. 08-1588, 239 Fed. Appx. 108, at *1 (3d Cir. Aug. 29, 2008) (unpublished opinion) (affirming district court's denial of pro se parent's request for appointment of counsel to represent her son); Dunbar v. Colasanto, No. 3:05-cv-1234 (CFD), 2006 WL 798883, at *1 (D. Conn. March 24, 2006) (denying parent litigant's pro se request for appointment of counsel for her minor child).